UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10075-RGS

HARRIET J. BALERNA

v.

CARMEL A. GILBERTI and MELVIN L. LEWIS
and EDWARD F. LEWIS, both individually and as
Executors of the Estate of Helen Lewis

v.

ALFRED J. BALERNA, et al.

<u>FINDINGS OF FACT AND RULINGS OF LAW
AFTER A TRIAL WITHOUT JURY</u>

November 24, 2010

STEARNS, D.J.

At the close of plaintiff's evidence during a three-day bench trial, the court granted the motions of defendants Melvin and Edward Lewis, as Executors of the Estate of Helen Lewis, for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). The ruling disposed of all but two counts of plaintiff Harriet Balerna's Complaint: Count I, a demand for an accounting; and Count II, a prayer for declaratory judgment. Two matters remain to be resolved: (1) whether the amended accounting should be confirmed; and (2) if so, the distribution of the surplus foreclosure sale funds that have been deposited with the court.     Based on the credible testimony and the exhibits offered at trial, as well as the stipulations of the parties, I find the following material facts.[1]

---

[1] Many of the facts developed at trial were initially set out in the court's Memorandum and Order of March 25, 2010, addressing Balerna's motion to dismiss a third-party cross-claim brought by Philip Dombrowski and his wife Jeannie against the Estate, and to the

## FINDINGS OF FACT

1. Harriet Balerna, a resident of California, brought this action through a Massachusetts attorney, Joseph Coppola (Coppola) against three Massachusetts residents, Melvin L. Lewis, his son, Edward F. Lewis, and the Lewises' attorney, Carmel A. Gilberti (Gilberti). In the Complaint, Balerna accused defendants of common-law conversion and breach of fiduciary duty. She also sought an accounting of funds paid to the Estate of Helen Lewis at the foreclosure sale of residential property located at 110 Wild Harbor Road in North Falmouth, Massachusetts (Property). The Property had been the residence of Ruth and James Drowne.

2. Alfred J. Balerna, Harriet Balerna's late husband, acquired title to the Property by virtue of a Quitclaim Deed dated January 10, 2000. The deed was recorded with the Barnstable Registry of Deeds in Book 12778, at pages 200-201, on January 13, 2000. On April 20, 2001, Alfred Balerna granted Helen Lewis a $26,500 mortgage on the Property. The mortgage was recorded with the Barnstable Registry of Deeds in Book 13746, at pages 5-15.[2] The Lewis mortgage constituted the senior lien on the Property.

3. On September 21, 2001, Alfred Balerna granted Harriet Balerna a mortgage in the amount of $136,000 on the Property, which was recorded on September 24, 2001 with the Registry of Deeds in Book 14256, at pages 206-208. This mortgage was immediately junior to the mortgage granted to Helen Lewis. No intervening liens or encumbrances

---

extent that they were developed at trial are repeated here.

[2]A confirmatory mortgage and security agreement dated October 22, 2001, was subsequently recorded with the Registry of Deeds in Book 14352, at pages 297-307.

were recorded on the Property.[3]

4. On October 18, 2001, Philip and Jeannie Dombrowski filed a lawsuit in Barnstable Superior Court against The Edgewater Investment Limited Partnership (EILP). On February 28, 2002, the Dombrowskis obtained a writ of attachment in the amount of $110,000 against James Drowne and the Edgewater Investment Group, Inc. (EIG) "standing in the name of Alfred J. Balerna."[4] The attachment was recorded with the Barnstable Registry of Deeds in Book 14871, at page 346. On December 29, 2005, the Dombrowskis obtained an execution in the amount of $152,519.79 against the Edgewater entities (but not against Drowne or Balerna).

5. On October 4, 2002, Ruth and James Drowne filed suit against Alfred and Harriet Balerna in Norfolk Superior Court, contesting the validity of the mortgage granted by Alfred to Harriet Balerna. The case languished until May of 2005, when the Superior Court conducted a five-day bench trial. On January 20, 2006, the Superior Court entered judgment for the Balernas. An appeal taken by the Drownes was dismissed by the Appeals Court on April 29, 2009, on Coppola's motion.

6. Helen Lewis died on June 8, 2003. Melvin Lewis was appointed Executor of her Estate. On November 22, 2004, Melvin Lewis, acting in his capacity as Executor, granted

---

[3] Subsequent to the recording of the second mortgage, a number of additional liens on the Property were filed.

[4] Alfred Balerna was a business associate of James Drowne and from time to time served as EIG's President. EIG was the general partner of EILP. Drowne owned the Edgewater entities. Balerna also appears to have had an ownership interest in the Edgewater entities, although the exact nature of that interest does not appear in the record.

his son, Edward Lewis, a power of attorney to foreclose on the Estate's interest in the Property. That same day, Edward Lewis granted a power of attorney to Gilberti, a Cape Cod-based lawyer, to initiate the foreclosure.

7. On December 3, 2004, Gilberti filed a foreclosure action on the Lewis mortgage in Barnstable Superior Court. Alfred Balerna did not defend the lawsuit and suffered a default judgment. On March 20, 2005, the court gave Gilberti permission to proceed with the foreclosure sale.

8. On April 22, 2005, Gilberti made an "open, peaceable, and unopposed entry" to conduct an auction of the Property. Following the auction, Ruth Drowne, the high bidder, defaulted and forfeited a $10,000 deposit. The second and third highest bidders declined to purchase the Property. On September 12, 2005, a second auction was held. Ruth Drowne was again the high bidder, but she again defaulted, now forfeiting a $20,000 deposit. The second highest bidder, Edward Lewis, then purchased the Property for $145,000 (the amount bid). Edward Lewis's title was recorded by way of a Foreclosure Deed on October 12, 2005, at the Registry of Deeds in Book 20357, at pages 331-334.[5] On October 13, 2005, Edward Lewis transferred $70,000 to Gilberti's IOLTA account.

9. On October 12, 2005 (the day of the closing), Ruth Drowne and two other lienholders filed a lawsuit in Barnstable Superior Court seeking, among other things, to set

---

[5]On August 17, 2009, Melvin Lewis deposited $33,266.25 into the court's registry. On January 4, 2010, acting through Gilberti, Lewis submitted an accounting of the foreclosure sale proceeds as directed by a December 1, 2009 Order of the court. An additional $10,300 was deposited into the court's registry on April 26, 2010, after Coppola pointed out an error in the first accounting, which had failed to credit the Estate for the refund of a $10,000 duplicate real estate tax payment.

aside the sale to Edward Lewis, the return of the Drownes' deposits, and an accounting. Gilberti entered an appearance in the Barnstable action on behalf of the Estate. The Barnstable action was eventually dismissed without any consequence to the Estate.

10. On January 16, 2009, Coppola filed this diversity lawsuit on behalf of Harriet Balerna against the Lewises in their individual capacities, as well as in their capacities as Executors of the Lewis Estate. Gilberti was also named as a defendant.

11. On August 10, 2009, Melvin Lewis filed a Third-Party Complaint interpleading the Dombrowskis and a number of other persons with possible claims on the surplus proceeds of the foreclosure sale.

12. The Dombrowskis asserted cross-claims, including one against Alfred and Harriet Balerna. The Dombrowskis sought a $30,000 judgment against the Balernas stemming from their November of 2002 purchase from EILP of two 99-year boat slip leases at the Half-Tide Marina (Marina) in Mashpee, Massachusetts. EILP had earlier granted a security interest to Alfred Balerna in equipment belonging to the Marina, which the Dombrowskis argued was intended to give Balerna preference over other creditors of EILP and EIG.[6]

13. On March 25, 2010, this court dismissed the Dombrowskis' cross-claim against the Balernas, holding that its subject matter was insufficiently related to the dispute over the foreclosure sale surplus.

14. The total proceeds from the foreclosure sale of the Property amounted to

---

[6]The foreclosure sale of a mortgage held on the Marina by an unidentified third-party in September of 2001 had cost the Dombrowskis their entire $101,650 investment in the boat slips.

$176,815. This sum consists of Edward Lewis's bid purchase price of $145,000, the two forfeited deposits totaling $30,000, and $1,815 in interest accrued after the surplus funds were deposited into the court.

15. According to the accounting, the expenses deducted from the sale proceeds totaled $133,249. The total includes the pay-off of the Lewis mortgage with interest ($55,026.84), the costs of the foreclosure, accounting and administrative Estate fees, taxes, and legal fees of $47,000 and costs of $7,600 paid by the Estate to Gilberti to defend the Estate's interests in the Barnstable and Norfolk actions.

16. The bench trial of this action commenced on July 6, 2010.

## RULINGS OF LAW

The court is satisfied with the accounting of the proceeds of the sale (as amended).[7] This would end the matter but for the need to address: (1) the motions for sanctions pursuant to 28 U.S.C. § 1927[8] brought by the Lewises against Coppola; and (2)

---

[7] Where Balerna challenges details of the accounting, the court finds defendants' evidence the more credible. It specifically rejects the insinuations of a conversion of any portion of the sale proceeds by the Lewises or Gilberti. The court further finds that the language of Clause 11 of the mortgage is sufficiently broad to justify the $17,000 in litigation expenses incurred by the Estate in the Barnstable action. Finally, I have reviewed the billing statements submitted by Gilberti and find her total hours billed and hourly billing rate to have been reasonable. To be clear, Coppola (on behalf of Balerna) has never challenged Gilberti's hourly rate or the amount of time billed. His complaint is that many of her efforts should never have been undertaken (or billed to the Estate).

[8] Section 1927. Counsel's liability for excessive costs.

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

the accusations of unethical conduct and criminality leveled by Coppola against Gilberti during the course of the trial. For the reasons that follow, the court will deny the Lewises' motions for sanctions, but will order Coppola to show cause why he should not be sanctioned under Fed. R. Civ. P. 11(b).[9]

## SANCTIONS

The imposition of sanctions is a matter committed to the discretion of the court. See Silva v. Witschen, 19 F.3d 725, 730 (1st Cir. 1994). "It is beyond serious dispute that a district court may use its inherent powers to assess attorneys' fees against a party that has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,' . . . [A] district court exercising its inherent powers in this fashion must describe the bad faith conduct with

---

[9](b) **Representations to the Court**. By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances:

\* \* \* \*

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
(3) the factual contentions have evidentiary support . . . after a reasonable opportunity for further investigation or discovery; . . .

Fed. R. Civ. P. 11(b)(2)-(3).

The 1993 advisory notes for Rule 11 clearly state that Rule 11 may be used in conjunction with Section 1927 sanctions. Relevant language in subdivision (d) of the advisory note: "Rule 11 is not the exclusive source for control of improper presentations of claims, defenses, or contentions. It does not supplant statutes permitting awards of attorney's fees to prevailing parties or alter the principles governing such awards. It does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under 28 U.S.C. § 1927."

7

'sufficient specificity,' accompanied by 'a detailed explanation of the reasons justifying the award.'" Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 13 (1st Cir. 1995) (internal quotations omitted). Under 28 U.S.C. § 1927, sanctions may be imposed against lawyers who "acted unreasonably and vexatiously in multiplying proceedings." Cruz v. Savage, 896 F.2d 626, 632 (1st Cir. 1990). "In this circuit, courts use a mainly 'objective standard' for the purposes of determining when a lawyer's actions are unreasonable or vexatious." Jensen v. Phillips Screw Co., 546 F.3d 59, 64 (1st Cir. 2008) (explaining that "[b]ehavior is vexatious when it is harassing or annoying, *regardless of whether it is intended to be so."* (emphasis supplied), quoting Cruz, 896 F.2d at 632).

I.  Section 1927 Sanctions

Section 1927 "applies when the lawyer displays 'a serious and studied disregard for the orderly process of justice,'. . . ; [the conduct] must 'be more severe than mere negligence, inadvertence, or incompetence,'. . . , but it does 'not require a finding of subjective bad faith,' . . . , nor repeated infractions." Northwest Bypass Group v. U.S. Army Corp of Eng'rs, 569 F.3d 4, 6 (1st Cir. 2009) (internal citations omitted). "Garden-variety carelessness or even incompetence, without more, will not suffice to ground the imposition of sanctions under section 1927. Rather, an attorney's actions must evince a studied disregard of the need for an orderly judicial process . . . or add up to a reckless breach of the lawyer's obligations as an officer of the court. . . . Bad faith is not an essential element, but a finding of bad faith is usually a telltale indicium of sanctionable conduct." Jensen, 546 F.3d at 64 (internal citations omitted).

The gist of the Lewises' complaint is that "Attorney Coppola was on notice at least

from the filing of the Individual Defendants' Motion to Dismiss [on August 10, 2009] that liability of Melvin and Edward would require proof of tortious acts committed [personally] by these persons and could not arise merely because they had acted as agents of the Estate." Defs.' Mot. at 7-8. The Lewises point out (and accurately so) that no evidence has ever been offered in support of the allegation that they were acting in their individual capacities in stewarding Helen Lewis's estate.

Coppola's defense boils down to the contention that the court's denial of the Lewises' motion to dismiss (which raised the same issue) was a sufficiently encouraging signal for him to proceed to trial on the individual claims. The denial of a motion to dismiss, however, does not automatically preclude the imposition of sanctions. See Alvarado-Morales v. Digital Equip. Corp., 843 F.2d 613, 618 (1st. Cir. 1988) (although the initial complaint did not "belabor meritless proceedings, counsel's failure to properly investigate the facts prior to filing suit and his failure to withdraw the complaint when the facts were revealed to him by defendants' attorney during the early stages of discovery" warranted the imposition of sanctions). In deciding a motion to dismiss, a court does not rule on the evidentiary sufficiency of a complaint, only on whether its factual and legal assertions allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief."

9

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (internal citations omitted).

This being said, Coppola's decision to proceed to trial was not manifestly unreasonable in light of the court's (unintentionally) curt denial of the motion to dismiss. In a minute order, the court wrote: "Plaintiff has adequately plead a tort claim against these defendants.  In order to determine the viability of Balerna's claims, the court orders defendants, as counsel and executors of the estate of Helen Lewis to provide the court with an accounting of the foreclosure sale . . . ."  Given the fact that the court appeared to give short shrift to the substance of the motion to dismiss and chose to reserve the issue until after having heard the evidence at trial, Coppola should be given the benefit of the doubt, particularly where so serious a matter as the imposition of sanctions is concerned. But see Lichtenstein v. Consol. Servs. Grp., Inc., 173 F.3d 17, 23 (1st Cir. 1999) ("It was . . . entirely appropriate for the court to consider the Rule 11 motion at the conclusion of the bench trial.  Courts should, and often do, defer consideration of certain kinds of sanctions motions until the end of trial to gain a full sense of the case and to avoid unnecessary delay of disposition of the case on the merits.  This is a sensible practice where the thrust of the sanctions motion is that institution of the case itself was improper.").

II.   Rule 11 Sanctions

Rule 11 prohibits filings made with an improper purpose, the offering of frivolous arguments, "and the assertion of factual allegations without 'evidentiary support' or the 'likely' prospect of such support."  Young v. City of Providence ex rel. Napolitano, 404 F.3d 33, 39 (1st Cir. 2005).  The fault need not be wicked or reckless, but must at least be "culpably careless."  Id.  Because of their serious implications, a district court must provide

10

"sufficient supporting reasons" in any decision to impose Rule 11 sanctions. Salois v. Dime Sav. Bank of New York, FSB, 128 F.3d 20, 28 (1st Cir. 1997).

In the Complaint filed on behalf of Balerna, Coppola accused Gilberti, "upon information and belief," of using proceeds from the foreclosure sale "to pay legal fees and expenses which did not arise from the Foreclosure Action or the foreclosure sale." Compl. ¶ 32.[10] The Complaint specifically referenced the Estate's payment to Gilberti of her fee for representing the Estate's interests in the Barnstable action. See id. ¶ 33. At trial, the court was presented with no evidence to suggest that the expenditure was inappropriate. Gilberti testified convincingly that had she not intervened in the Barnstable action, the $30,000 in forfeited deposits might well have been restored to the Drownes. This explanation was made known to Coppola early in the litigation, see Dkt. 17 ¶ 9, and the allegation of impropriety should have been withdrawn. (The court warned Coppola at the beginning of the trial that he risked being assessed costs if he could not corroborate the accusation).

Of greater concern are the numerous accusations of unethical and criminal conduct leveled by Coppola against Gilberti during the course of the trial. The court notes the following excerpts as particularly troubling and offensive. In the first excerpt, Coppola is responding to the court's opening query whether the conceivable damages to Harriet Balerna justified the time and expense of a full-blown trial.

    MR. COPPOLA: I could address that quickly, your Honor.

---

[10]In drafting a complaint, "we caution [attorneys] against the deliberate or careless use of unsubstantiated allegations, notwithstanding their relevance." Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP, 175 F.3d 14, 17 (1st Cir. 1999).

> The fact is – the allegation is that the Lewis mortgage, which was foreclosed, and the estate, took excessive fees and interests. Very simple to analyze that, your Honor. Massachusetts has a criminal usury statute –
>
> MS. GILBERTI: Which is not –
>
> MR. COPPOLA: May I be heard?
>
> THE COURT: Go ahead.
>
> MR. COPPOLA: – criminal usury statute, and it is criminal to take more than 20 percent per year. And they clearly did that. And the law interprets that as including interest fees and attorney fees.

Tr., Day 1 at 5-6.

Despite the court's warning that Coppola was "blazing new trails" by suggesting that a lawyer's fee was covered by the criminal usury statute,[11] he continued to press the issue while adding a new accusation .

> MR. COPPOLA: The other perspective that it would be excessive is that the fees were incurred – much of the fees were incurred after the deed was transferred. And we contend that Attorney Gilberti and Mr. Lewis basically approved each other's charges without question, sort of a situation where you have the cat guarding the milk.
>
> And, your Honor, when someone holds the foreclosure proceeds, they have a fiduciary duty to hold those funds in trust. And Attorney Gilberti, by virtue of holding it in her conveyancing account, and the executor, by virtue of conducting the foreclosure and taking in fees, the proceeds, has a fiduciary duty.

Id. at 7.

After Gilberti pointed out (correctly) that Coppola had no standing to raise the usury issue, Coppola returned to the charge of misappropriation of the entrusted funds.

---

[11]As the court explained, Coppola's interpretation of the law would make every attorney who accepted a contingency fee that is greater than 20 percent guilty of a crime. Tr. at 6-7.

> MR. COPPOLA: There is [sic] also issues of the charges that were taken from the proceeds, not just for attorneys' fees.
>
> For example, a $5,000 check was written to Edward Lewis, purportedly for estate time, your Honor. Mr. Lewis gave – and that came out of the proceeds.
>
> Mr. Lewis gave Attorney Gilberti, before she wrote that check, no written backup for that. They had a conversation about how much time he supposedly spent, and she wrote him a check for five grand out of the proceeds.

Id. at 10.

A few minutes later, Coppola reasserted an earlier allegation that Gilberti and the Lewises had lied about paying the actual cash portion of the purchase price of the Property.[12]

> Mr. COPPOLA: In addition, we have issue with the fact that whether, in fact, the 70 – the purchaser wired $70,000 to Attorney Gilberti's conveyancing account as part of the purchase proceeds for the [$145,000] purchase price.

Id.

He then accused Gilberti of conversion.

> MR. COPPOLA: Your Honor, there's a conversion claim which is a part of this, and a breach of fiduciary duty claim. This goes directly to those.
>
> THE COURT: To have a conversion, somebody's got to convert something, and you haven't shown me what it is.

---

[12]Coppola also alleged that deliberately false pleadings had been prepared by Gilberti and in some cases filed with the court. He alleged that Gilberti had "misrepresented, . . . in accounts filed with this court, in answers to interrogatories, that the proceeds were paid, when they were not." Tr. at 21. The court warned Coppola that he was "making a fairly strong accusation," to which he responded that he could "back it up." Id. He later returned to the assertion that Gilberti had falsified pleadings. "The fact is we asked for an accounting of those proceeds. We were provided false information. We were provided false information under oath. We were provided false information as to the answers to interrogatories." Tr. at 31.

13

Where's the beef? What isn't accounted for that your client is entitled to?

MR. COPPOLA: And just to reiterate something I had mentioned earlier.

It's also relevant because they're claiming a significant amount in attorney fees in a lawsuit that could have been ended had they showed proof of the payment.

Id. at 26. Coppola returned to these same themes in his examination of Gilberti.

DIRECT OF CARMEL GILBERTI

MR. COPPOLA: As part of that adjustment, on 10/13/05, you have a loan balance payment of $55,026.84. Do you see that?

MS. GILBERTI: That's correct. That was the –

MR. COPPOLA: Are you aware that that is greater – principal and interest greater than 20 percent per year?

\* \* \*

THE COURT: I haven't looked at the complaint for a while, but I don't remember this being raised as a cause of action –

\* \* \*

THE COURT: – or even being mentioned in there.

MR. COPPOLA: The cause of action is that the payments were excessive, your Honor. It is – as a matter of law, it is illegal to charge more than 20 percent per year.

THE COURT: I'm not so sure that's the case in this context, but there is no notice in the complaint that this is a claim that was being made.

MR. COPPOLA: The claim is that the payments were excessive.

THE COURT: Don't you have to write these things down in the complaint?

MR. COPPOLA: I think the complaint certainly includes the claim.

14

The payments were excessive.

THE COURT: You're going to have to show me where in the complaint there is any reference to the usury statute.

MR. COPPOLA: There is not a reference to the usury statute, your Honor.

THE COURT: That's a problem.[13]

\*     \*     \*

MR. COPPOLA: I am not – obviously, I cannot advance a criminal claim, your Honor. But, by definition, as a matter of law, on a loan like this the lender may not. It is illegal.

\*     \*     \*

THE COURT: Well, do we really want to go – I mean, what standing do you have to make this argument? Are you the Attorney General?

MR. COPPOLA: Representing the junior lienholder who would expect any surplus proceeds.

THE COURT: Under the statute, either the Attorney General or the person who borrows the money has the standing to bring the complaint.

MR. MARKOFF: Yes, your Honor.

MR. COPPOLA: Your Honor, I respectfully disagree, if it is illegal. By any standard, it would be excessive. I mean, the interest rate was –

THE COURT: Let's get on with the accounting.

Day 2 Tr. at 36-38.

Coppola then resumed his examination of Gilberti.

MR. COPPOLA. You did file an accounting. Yes, you did. But you made

---

[13]Although the usury charge permeated many of the pleadings and the trial, it was never argued in the Complaint, nor could it be, as the criminal statute does not confer standing on any private citizen except the person to whom the loan was made. See Mass. Gen. Laws ch. 271, § 49. In this case, the borrower was Alfred Balerna.

15

false statements; did you not?

MR. MARKOFF: Objection, your Honor.

THE COURT: Very strong words, Mr. Coppola. You better be very careful.

MS. GILBERTI: I am really tired of your accusations, Joe. I'm going to tell you that right now.

THE COURT: Let's –

MS. GILBERTI: I'm a good attorney. I've done nothing wrong.

(Whereupon, the witness breaks down.)

THE COURT: You want to take –

MS. GILBERTI: Yes, please.

THE COURT: Let's take a brief recess.

THE CLERK: All rise.

(Recess.)

THE CLERK: All rise for the Honorable Court.

Court is open. You may be seated.

THE COURT: Mr. Coppola, just a couple of words.

First, it is highly unprofessional to ask a witness to comment on the truthfulness of another witness. We simply do not do that.

More of concern to me is accusing another lawyer of having committed a criminal offence, which you've done now twice; with respect to the usury statute and again with claiming that a false statement was made under oath to a Court in a pleading. This is not only defamatory, [but] for the litigation privilege, but it's also a violation of your responsibility under Rule 8.3 of the Rules of the Board of Bar Overseers.

8.3 states: If a lawyer is aware that another lawyer had committed an unprofessional act that questions their fitness to serve as counsel, you have

> an obligation to report that to the Board of Bar Overseers.
>
> I doubt you've done that in this case. So I suggest as we go forward you be very careful about how you frame these questions. Making these kinds of accusations is not professional.
>
> I understand why the witness is upset. I would be upset, too, but for the fact I have to suffer more accusations than you probably do of the kind, so I am a little more hardened to it. But I don't want to hear any more of this.

Id. at 40-41.

Any one of these accusations cast an aspersion on Gilberti's character, but in combination they raise "a substantial question as to [her] honesty, trustworthiness or fitness as a lawyer." Supreme Judicial Court Rule 3:07, Mass. Rules of Professional Conduct 8.3. Under Rule 8.3, Coppola had a duty to report Gilberti to the Board of Bar Overseers if he truly believed that she had misappropriated funds, committed a crime, or filed false declarations with the court. See Rule 8.3 cmt. 3A ("An immediate report is ethically compelled . . . when a client or third person will likely be injured by a delay in reporting, such as where the lawyer has knowledge that another lawyer has embezzled client or fiduciary funds and delay may impair the ability to recover the funds.").[14] It is undisputed that no such report was filed by Coppola with the Massachusetts Board of Bar Overseers.

## ORDER

For the foregoing reasons, judgment will be entered for defendants on the remaining Counts of the Complaint. Attorney Coppola is ordered to show cause within twenty-one

---

[14]"A lawyer has knowledge of a violation when he or she possesses supporting evidence such that a reasonable lawyer under the circumstances would form a firm opinion that the conduct in question had more likely occurred than not." See id. cmt. 3.

17

(21) days of the date of this opinion why he should not be sanctioned pursuant to Rule 11(b) for making baseless accusations against attorney Gilberti regarding her conduct in representing the Estate.  See Landscape Props., Inc. v. Whisenhunt, 127 F.3d 678, 683-684 (8th Cir. 1997).  The court will reserve its ruling on the final disposition of the $43,566.25 deposited with the court until the Rule 11 sanction issue is resolved.  The Clerk, in the interim, will close the case.

                SO ORDERED.

                /s/ Richard G. Stearns

                _____
                UNITED STATES DISTRICT JUDGE