UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10075-RGS

HARRIET J. BALERNA

v.

CARMEL A. GILBERTI and MELVIN L.
LEWIS and EDWARD F. LEWIS, both
individually and as Executors of the Estate of
Helen Lewis

MEMORANDUM AND ORDER ON THE
IMPOSITION OF SANCTIONS UNDER
FED. R. CIV. P. 11 AND THE
DISPOSITION OF SURPLUS FUNDS

February 7, 2012

STEARNS, D.J.

## Background

This case involves unfounded accusations of criminality and unethical conduct

leveled by a lawyer against his opposing counsel during the trial of an otherwise

mundane dispute over an accounting of the proceeds of a foreclosure sale. The

haggling over the issue is chronicled in the court's November 24, 2010 decision, which

followed a three-day non-jury trial. *See Balerna v. Gilberti*, 2010 WL 4878286 (D.

Mass. Nov. 24, 2010). The dispute moved to federal court in 2009, when Attorney

Joseph J. Coppola filed a complaint against Melvin and Edward Lewis (father and son),

the Executors of the Estate of Helen Lewis (the wife of Melvin and mother of Edward), and Attorney Carmel A. Gilberti, the lawyer for the Lewis Estate.

Attorney Gilberti was hired in 2004 by the Executors to collect a $26,500 first mortgage granted on April 20, 2001, by Alfred Balerna (Harriet Balerna's late husband), to Helen Lewis on a residence at 110 Wild Harbor Road in North Falmouth, Massachusetts (Property).[1] Helen Lewis died in June of 2004. Melvin Lewis, through his son Edward , granted a power of attorney to Gilberti in November of 2004. A month later, Gilberti filed a foreclosure action against the Property in the Barnstable Superior Court, which Alfred Balerna did not defend. On March 2, 2005, a default judgment entered against Alfred Balerna. Two failed foreclosure auctions followed, resulting in the forfeiture of deposits totaling $30,000 by Ruth Drowne, a former owner of the Property. After Drowne's second default, the Property was sold for $145,000 to Edward Lewis (who was the next highest bidder).

On October 12, 2005, the day that Lewis took title (by way of a foreclosure deed) to the Property, Ruth Drowne filed an action in the Barnstable Superior Court to

---

[1] A few months after granting the first mortgage to Helen Lewis, on September 21, 2001, Alfred Balerna granted a junior mortgage to Harriet Balerna in the amount of $136,000.

set aside the sale and return the forfeited deposits.[2]  Gilberti defended the Lewis Estate in the matter (which was eventually dismissed) in which she was also named as a defendant.  On January 16, 2009, Coppola filed this diversity action in the federal district court. The Complaint named the Lewises in their individual capacities as well as in their capacities as Executors of the Lewis Estate, and demanded an accounting of the foreclosure sale proceeds.  Somewhat unusually, Coppola also named Gilberti personally as a defendant, accusing her "upon information and belief" of fraudulently converting the sale proceeds "to pay legal fees and expenses which did not arise from the Foreclosure Action or the foreclosure sale."  Compl. ¶ 32.  In addition to conversion, the Complaint alleged a breach of fiduciary duty on Gilberti's part and asserted that she had violated the Massachusetts Rules of Professional Conduct in her handling of the foreclosure proceeds.  *See id*. ¶¶ 39, 52-55.  The only instance of an alleged conversion cited in the Complaint was the reimbursement by the Lewis Estate of Gilberti's fees in defending the Barnstable action.[3]  *See id.* ¶¶ 33, 50.

---

[2] In 2002, Ruth Drowne and her husband James also filed suit against the Balernas in Norfolk Superior Court challenging the validity of the second mortgage on the Property granted to Harriet Balerna.  That lawsuit, in which Coppola represented the Balernas, resulted in a five-day bench trial and a judgment favorable to the Balernas in 2006.  (The Norfolk case, however, lingered until 2009 when an appeal taken by the Drownes was dismissed by the Appeals Court).

[3] At trial, Coppola embellished the claim against Gilberti to include an alleged violation of the Massachusetts criminal usury statute, Mass. Gen. Laws ch. 271, § 49.

The accounting of the sale submitted by Gilberti in the federal action (adjusted by a $10,300 credit for an overlooked real estate tax refund payment identified by Coppola), showed as follows: gross proceeds of $176,815 (including interest) and gross expenses of $133,249. The expenses included the pay-off of the Lewis mortgage with interest ($55,027), the costs of the two sales, including auction fees, a services-rendered payment to Edward Lewis, taxes, and title adjustment fees. Gilberti was also paid her costs and legal fees, a total of $47,000, which included $17,000, that she billed for the Barnstable matter.

After discovery, the court dismissed the claims of a number of third-party defendants laying claim to the surplus. *See Balerna v. Gilberti*, 266 F.R.D. 42 (D. Mass. 2010). A non-jury trial was then held on the Balerna Complaint beginning on July 6, 2010. On November 24, 2010, the court issued its findings and rulings confirming the final accounting, including the expenses incurred in the Barnstable action, which the court found to fall within the "Mortgagee's Right to Cure and Expenses" clause of the mortgage.[4] *Balerna*, 2010 WL 4878286, at *3. Then, after

He also insinuated that she had made false declarations in pleadings filed with the court.

[4] In dismissing the breach of fiduciary duty claim against Gilberti, the court noted the obvious – that there was no conceivable fiduciary duty owed by Gilberti to Harriet Balerna, who was Coppola's client. Coppola states in an affidavit that this claim was premised on research that he had conducted that had persuaded him that Gilberti "might

4

citing at length from the transcript of the trial, the court ordered Attorney Coppola to show cause why he should not be sanctioned pursuant to Fed. R. Civ. P. 11(b), "for making baseless accusations against Attorney Gilberti regarding her conduct in representing the [Lewis] Estate." *Id.*, at *8. The Order to Show Cause specified three areas of potentially sanctionable conduct against Coppola: (1) the accusation that Gilberti had converted money from the proceeds of the sale for her personal defense in the Barnstable action: (2) the accusation that she had engaged in criminal usury in violation of Massachusetts state law by charging a fee in excess of 20 percent of the value of the Lewis mortgage; and (3) that she had filed false declarations with the court (most notably, in her accounting of the foreclosure funds). *Id.,* at *5-8.

## Subsequent Proceedings

Immediately following the entry of the Order to Show Cause, Coppola moved

---

owe the junior lienholders a fiduciary duty." Dkt # 111-1 at 4. The court is puzzled as to the substance of Coppola's research as Massachusetts law makes it as plain as a pikestaff that an attorney does not owe a fiduciary duty to a person who she does not represent. *Logotheti v. Gordon*, 414 Mass. 308, 312 (1993); *Robertson v. Gaston Snow & Ely Bartlett*, 404 Mass. 515, 522 (1988); *Page v. Frazier*, 388 Mass. 55, 61-68 (1983). *See also Spinner v. Nutt*, 417 Mass. 549, 552-554 (1994) (an attorney's duty to a trustee does not extend to the beneficiaries of the trust). There is only one possible exception: "in certain circumstances a lawyer owes a duty of care to a nonclient who he or she knows will rely on the services rendered." *Kirkland Constr. Co. v. James*, 39 Mass. App. Ct. 559, 561 (1995). However, there is no conceivable basis on which this exception could apply to the facts of this case, facts which were intimately familiar to Coppola by virtue of his representation of the Balernas.

for an extension of the return date to obtain the transcript of the trial. The motion was granted. On April 26, 2011, the official transcript of the first two days of the trial was docketed by the court reporter and Coppola was given until May 17, 2011, to respond. On April 27, 2011, appearances on behalf of Coppola were entered by attorneys David Dineen and Robert Muldoon, Jr., who promptly moved for a further extension while the transcript of Day 3 of the trial was completed. The motion was allowed. The final portion of the transcript was filed on May 13, 2011, and Coppola responded to the Order to Show Cause on May 17, 2011. Gilberti filed a response of her own on June 6, 2011, followed by a reply from Coppola (now represented by Attorney Matthew Moschella) on June 16, 2011.

## Federal Rule of Civil Procedure 11(b)

"[T]he central purpose of Rule 11 is to deter baseless filings in district court . . . . Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, *legally tenable*, and 'not interposed for any improper purpose.' An attorney who signs the paper without such a substantiated belief 'shall' be penalized by 'an appropriate sanction.' Such a sanction may . . . include payment of the other parties' expenses." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (emphasis added). The range of sanctions available to the court is broad. In addition

to monetary penalties, the "most prominent are reprimands, orders to undergo continuing education . . . , and referral to disciplinary authorities." 5A Wright & Miller, *Federal Practice and Procedure* § 1336.3 at 695-696 & nn. 60, 61, 62 (3d ed. 2004). Tailoring of the penalty to fit the offense is a key consideration – guided by the admonition that the sanction imposed should be the least severe of the available alternatives necessary to serve the purposes of Rule 11. *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 535 (5th Cir. 1992); Wright & Miller, § 1336.3 at 688 & n.41.

A claim is frivolous under Rule 11 when it is "either not well-grounded in fact or unwarranted by existing law." *Cruz v. Savage*, 896 F.2d 626, 632 (1st Cir. 1990). "[I]n making Rule 11 determinations, judges should not employ the wisdom of hindsight, but should consider the reasonableness of the attorney's conduct at the time the attorney acted." *Id.* at 633. "However, a litigant's obligations with respect to the contents [of his filings] are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11 advisory committee's note.

## Coppola's Defenses and Explanations

Turning to the substance of the cited instances of possible misconduct, I will address each of Coppola's explanations in turn.

**(a) conversion**

In its opinion of November 24, 2010, the court highlighted the following.

> In the Complaint filed on behalf of Balerna, Coppola accused Gilberti, "upon information and belief," of using proceeds from the foreclosure sale "to pay legal fees and expenses which did not arise from the Foreclosure Action or the foreclosure sale." Compl. ¶ 32. The Complaint specifically referenced the Estate's payment to Gilberti of her fee for representing the Estate's interests in the Barnstable action. *See id.* ¶ 33. At trial, the court was presented with no evidence to suggest that the expenditure was inappropriate. Gilberti testified convincingly that had she not intervened in the Barnstable action, the $30,000 in forfeited deposits might well have been restored to the Drownes. This explanation was made known to Coppola early in the litigation, *see* Dkt. 17 ¶ 9, and the allegation of impropriety should have been withdrawn. (The court warned Coppola at the beginning of the trial that he risked being assessed costs if he could not corroborate the accusation).

*Balerna*, 2010 WL 4878286, at *5 (footnote omitted).

Coppola's explanation of his reasoning in drafting paragraph 32 of the Complaint is founded on his purported belief that by charging the Lewis Estate with the costs of defending the Barnstable action, Gilberti committed the tort of conversion. Coppola contends that he reasonably believed that the charge was improper in part because "the Mortgage document itself did not allow the Estate to use sale proceeds for an action unrelated to the foreclosure sale or foreclosure action," and in part because he believed that a portion of the charge reflected the costs of Gilberti's personal defense (she was

8

named individually as a defendant in the Barnstable matter).[5] Resp. to Order to Show Cause, at 9 (Dkt # 111). Neither of these rationales has any force. The eleventh covenant of the mortgage agreement, entitled "Mortgagee's Right to Cure and Expenses" provides in relevant part:

> The Mortgagee shall be entitled . . . to commence, intervene in or otherwise participate in any legal or equitable proceeding which in the Mortgagee's sole judgment affects the Mortgaged Property or any rights created or secured by this Mortgage or any obligation secured hereby. If the Mortgagee shall become involved in any [such] action . . . the Mortgagor shall, on demand, reimburse the Mortgagee for all charges, costs, and expenses incurred by the Mortgagee in connection therewith, including without limitation attorneys' fees . . . .

Foreclosure Accounting (Dkt # 71-3).

It is simply not credible that a reasonable attorney, particularly one of Coppola's not inconsiderable experience, could have read this covenant without recognizing that it gave express authorization to Gilberti to participate in the Barnstable action and to be paid her fees and costs. As a practical matter, had Gilberti not intervened in the Barnstable action, the result would have been the likely loss of the $30,000 to the

---

[5] Coppola in his response to the Order to Show Cause also lumps under the category of a conversion the $5,000 payment (through Melvin Lewis) that Gilberti authorized be paid to Edward Lewis for personal services rendered in connection with the foreclosure auctions. While the documentation of the actual services involved leaves much to be desired, the payment to Edward Lewis was not identified in the Complaint as a conversion and it was unfair to spring this accusation on Gilberti during her examination at trial.

Lewis Estate in forfeited deposits, as well as a rescission of the sale of the Property to Edward Lewis. Moreover, any reasonable attorney would have understood that although Gilberti had been named in her individual capacity in the Barnstable action, her presence as a defendant was related solely to her capacity as the attorney for the Lewis Estate.

Finally, in the affidavit submitted with his response to the Order to Show Cause, Coppola argues that because the civil tort of conversion "does not require proof of *mens rea* or criminal intent . . . . I do not view making a claim for conversion against Attorney Gilberti in the context of civil litigation as an 'accusation of unethical conduct.'" Coppola Aff. ¶ 17. This declaration is somewhat disingenuous. While the claim that the tort of conversion is not technically a crime is true enough, the tort has a markedly pejorative connotation.[6] To complete the tort, the interference with the property rights of another must (in the usual run of cases) be wrongful. *See* Joseph R. Nolan & Laurie J. Sartorio, 37 *Massachusetts Practice Series: Tort Law* § 4.5 at 77 (2005) ("It is perfectly clear that only a wrongful exercise of dominion qualifies for conversion."). "Wrongful," as it is understood in both legal and common parlance

---

[6] The civil tort requires proof of a wrongful or intentional interference with the property rights of another with the intent of depriving that person permanently of the use of the property. *See In the Matter of Hilson*, 448 Mass. 603, 611 (2007).

when describing a tortfeasor, comports with "unfairness or injustice," and means "[c]ontrary to law; unlawful," as in "[o]ne who violates the law <both criminals and tortfeasors are wrongdoers>." Black's Law Dictionary 1751 (9th ed. 2009). The sting of the word is all the more acute when the accusation involves an alleged misappropriation of funds held in trust by a lawyer. *See Grand Pac. Fin. Corp. v. Brauer*, 57 Mass. App. Ct. 407, 413 (2003) (labeling a law firm's payment of its legal fees from a restricted escrow account as "an act of 'self-dealing'"and characterizing the firm's arguments attempting to justify its conduct as "sophistry," and "border[ing] on the absurd"). Unlawful wrongdoing on Gilberti's part is exactly the connotation that Coppola meant to convey by his citation in the Complaint to Rule 1.15 of the Massachusetts Rules of Professional Conduct, which addresses an attorney's high ethical obligations with respect to funds that she holds in a fiduciary capacity.

**(b) accusations of criminal conduct**

In its November 24, 2010 decision, the court cited the following exchanges with Coppola "as particularly troubling and offensive."

> In the first excerpt, Coppola is responding to the court's opening query whether the conceivable damages to Harriet Balerna justified the time and expense of a full-blown trial.

> MR. COPPOLA: I could address that quickly, your Honor.

> The fact is – the allegation is that the Lewis mortgage,

which was foreclosed, and the estate, took excessive fees and interests. Very simple to analyze that, your Honor. Massachusetts has a criminal usury statute –

MS. GILBERTI: Which is not –

MR. COPPOLA: May I be heard?

THE COURT: Go ahead.

MR. COPPOLA: – criminal usury statute, and it is criminal to take more than 20 percent per year. And they clearly did that. And the law interprets that as including interest fees and attorney fees.

Despite the court's warning that Coppola was "blazing new trails" by suggesting that a lawyer's fee was covered by the criminal usury statute,[] he continued to press the issue while adding a new accusation.

MR. COPPOLA: The other perspective that it would be excessive is that the fees were incurred – much of the fees were incurred after the deed was transferred. And we contend that Attorney Gilberti and Mr. Lewis basically approved each other's charges without question, sort of a situation where you have the cat guarding the milk. And, your Honor, when someone holds the foreclosure proceeds, they have a fiduciary duty to hold those funds in trust. And Attorney Gilberti, by virtue of holding it in her conveyancing account, and the executor, by virtue of conducting the foreclosure and taking in fees, the proceeds, has a fiduciary duty.

After Gilberti pointed out (correctly) that Coppola had no standing to raise the usury issue, Coppola returned to the charge of misappropriation of the entrusted funds.

MR. COPPOLA: There is [sic] also issues of the charges

that were taken from the proceeds, not just for attorneys' fees. For example, a $5,000 check was written to Edward Lewis, purportedly for estate time, your Honor. Mr. Lewis gave – and that came out of the proceeds. Mr. Lewis gave Attorney Gilberti, before she wrote that check, no written backup for that. They had a conversation about how much time he supposedly spent, and she wrote him a check for five grand out of the proceeds.

A few minutes later, Coppola reasserted an earlier allegation that Gilberti and the Lewises had lied about paying the actual cash portion of the purchase price of the Property.[]

> Mr. COPPOLA: In addition, we have issue with the fact that whether, in fact, the 70 – the purchaser wired $70,000 to Attorney Gilberti's conveyancing account as part of the purchase proceeds for the [$145,000] purchase price.

He then accused Gilberti of conversion.

> MR. COPPOLA: Your Honor, there's a conversion claim which is a part of this, and a breach of fiduciary duty claim. This goes directly to those.

*Balerna*, 2010 WL 4878286, at *5-6.

Coppola returned to these same themes in his examination of Gilberti.

> MR. COPPOLA: As part of that adjustment, on 10/13/05, you have a loan balance payment of $55,026.84. Do you see that?

> MS. GILBERTI: That's correct. That was the –

> MR. COPPOLA: Are you aware that that is greater – principal and interest greater than 20 percent per year?

\* \* \*

THE COURT: I haven't looked at the complaint for a while, but I don't remember this being raised as a cause of action –

\* \* \*

MR. COPPOLA: The cause of action is that the payments were excessive, your Honor.  It is – as a matter of law, it is illegal to charge more than 20 percent per year.

THE COURT: I'm not so sure that's the case in this context, but there is no notice in the complaint that this is a claim that was being made.

\* \* \*

MR. COPPOLA: There is not a reference to the usury statute, your Honor.

THE COURT:  That's a problem.

\* \* \*

MR. COPPOLA: I am not – obviously, I cannot advance a criminal claim, your Honor.  But, by definition, as a matter of law, on a loan  like this the lender may not.  It is illegal.

\* \* \*

THE COURT: Well, do we really want to go – I mean, what

standing do you have to make this argument?  Are you the Attorney General?

MR. COPPOLA: Representing the junior lienholder who would expect any surplus proceeds.

THE COURT: Under the statute, either the Attorney General or the person who borrows the money has the standing to bring the complaint.

\* \* \*

MR. COPPOLA: Your Honor, I respectfully disagree, if it is illegal.  By any standard, it would be excessive.  I mean, the interest rate was –

THE COURT: Let's get on with the accounting.

Coppola then resumed his examination of Gilberti.

MR. COPPOLA.  You did file an accounting.  Yes, you did.  But you made false  statements; did you not?

THE COURT: Very strong words, Mr. Coppola.  You better be very careful.

MS. GILBERTI: I am really tired of your accusations, Joe.  I'm going to tell you that right now.

THE COURT:  Let's –

MS. GILBERTI: I'm a good attorney. I've done nothing wrong.

(Whereupon, the witness breaks down.)

* * *

*Id.*, at *5-7.

As the court noted in its decision, Coppola also accused Gilberti of filing false pleadings.

> Coppola also alleged that deliberately false pleadings had been prepared by Gilberti and in some cases filed with the court. He alleged that Gilberti had "misrepresented, . . . in accounts filed with this court, in answers to interrogatories, that the proceeds were paid, when they were not." The court warned Coppola that he was "making a fairly strong accusation," to which he responded that he could "back it up." He later returned to the assertion that Gilberti had falsified pleadings. "The fact is we asked for an accounting of those proceeds. We were provided false information. We were provided false information under oath. We were provided false information as to the answers to interrogatories."

*Id.*, at *6 n.12 (Trial transcript citations omitted).

By way of extenuation, Coppola argues that his reference to the criminal usury statute, Mass. Gen. Laws ch. 271, § 49, was meant merely as an analogy or benchmark against which the court could determine whether the fees and costs Gilberti charged to the Estate were excessive. The argument is not entirely clear, but the idea apparently is that Gilberti's pay-off of the first mortgage at the interest rate stipulated in the mortgage documents, when coupled with the payment of her fees, made her responsible

in some fashion for a usurious loan. In coming to this conclusion, Coppola states that he relied on a decision of the Supreme Judicial Court, *Begelfer v. Najarian*, 381 Mass. 177, 189 n.16 (1980), which noted that an unregistered lender was statutorily barred from charging in excess of twenty percent for a loan and in reforming the underlying note, ordered the recomputation of a folded-in attorneys' fee. The reliance on *Begelfer* is, however, unreasonable. *Begelfer* involved a default provision that accelerated the payment of the principal of a loan in full with seventeen percent interest on the entire amount plus an additional fifteen percent on sums overdue plus the attorneys' fees. Here, the critical distinction is the obvious – Gilberti was not a lender and therefore the usury statute does not apply to her. Her fees here are not in the nature of a loan to the Estate, but are part of the legal costs normally associated with a foreclosure on mortgaged property.

Coppola's second explanation is a response to the court's observation at trial that Coppola's invocation of the criminal usury statute seemed pointless in that his client, Harriet Balerna, would in any event have no standing to seek relief under it. Under the statute, only the borrower is entitled to such relief, which is of an equitable nature, and usually takes the form of a reformation of the interest rate of the loan. Additionally, the Commonwealth's prosecutorial authorities may proceed under the criminal provisions

of the statute (which authorize a sentence of up to ten years in state prison for offending lenders). Coppola states that he had a Superior Court opinion in mind, *LMB Fin., LLC v. Edgewater Inv. Ltd. P'ship*, 18 Mass. L. Rptr. 226 (Mass. Super. 2004), a case involving the financial collapse of the Half-Tide Marina in Mashpee. Many of the same actors who from time to time have played a role in this long-running litigation appear in that case. For instance, James Drowne, Ruth's husband, and Alfred Balerna, James Drowne's partner, were the developers of the ill-named marina.[7] In *Edgewater*, it is true that Justice Nickerson held that a junior attaching creditor has standing to contest the validity of a senior note and mortgage under the usury statute, citing *Kirk v. McDonald*, 21 Mass. App. Ct. 21, 25 (1985). This, however, is of no relevance here where Harriet Balerna is not questioning the validity of the mortgage granted by her husband to Helen Lewis, but rather the fees charged to collect it.[8]

In summary, the charges leveled by Coppola against Attorney Gilberti were

----

[7] As the Balerna's attorney, Coppola was apparently involved in aspects of the *Edgewater* litigation.

[8] Even assuming that Harriet Balerna had standing to challenge the Lewis Mortgage under the usury statute, a victory on that ground would not change her status as a junior lienholder. As Justice Nickerson pointed out in *LMB*, a usurious loan is not void ab initio, but is subject to reformation. 18 Mass. L. Rptr. at *4. *See also Beach Assocs., Inc. v. Fauser*, 9 Mass. App. Ct. 386, 394 (1980).

false, reckless, and based on no reasonable assessment of the law.[9]  To compound

matters, Coppola persisted in making allegations of criminal conduct, conversion, and

false statements over a three-day trial despite repeated warnings from the court that he

was in danger of crossing a red line.  His persistence is all the more puzzling given his

experience and apparently unblemished record as a lawyer.  Nonetheless, his statement

in his Response to the Order to Show Cause that "(b) [he] did not accuse Ms. Gilberti

of criminal conduct, misappropriating client's funds, or deliberately filing false

declarations with the Court, and (c) [he] had a good faith basis for the factual and legal

contentions contained in his pleadings and his arguments to the Court," is belied by the

transcript of the trial in the first instance and highly questionable in the second.  *See*

Dkt # 111 at 5.  Under the circumstances, given the heedless and unnecessary damage

inflicted on Attorney Gilberti's reputation, sanctions are warranted.

---

[9] I do not question the propriety of Coppola's demand of an accounting on behalf of his client.  Gilberti made herself vulnerable to such a demand by not addressing the issue of an accounting earlier (notwithstanding the fact that tangential litigation was wending its way through the state courts).  Nor do I think it improper for Coppola to have raised questions about the amount of the fees charged by Gilberti to the Estate (and ultimately to the foreclosure funds), although I do not find (nor did Coppola) that there was anything unreasonable about Gilberti's hourly rate, the hours that she devoted to legal tasks, or the adequacy of the documentation of her time.  Finally, it was not improper to question Gilberti about expenses charged to the Estate (such as the $5,000 payment to Edward Lewis for undocumented services).  All of these were fair subjects of inquiry, had the inquiry been conducted fairly.

## The Appropriate Sanction to be Imposed

Gilberti asks (not unreasonably) that sanctions take the form of an order requiring Coppola to reimburse her for the costs of defending herself in the underlying lawsuit. This would be the court's preference, but for an odd procedural obstacle raised by Rule 11. Pointing to the amended Rule 11(c)(4), Coppola maintains that the court does not have the discretion to award Gilberti her attorney's fees. Coppola notes that the literal language of the Rule states that the court may order payment of reasonable attorney's fees and expenditures resulting from a Rule 11 violation only "if imposed on motion" by the aggrieved party, while here the court raised the issue of Rule 11 sanctions sua sponte. Because the 2007 amendments to Rule 11 were (according to the advisory committee's note) "intended to be stylistic only," one need look to the entire history of practice under Rule 11 beginning in 1983 when the Rule was substantively amended to clarify and expand the range of authorized sanctions. (The current relevant language was carried forward from prior Rule 11(c)(2)). That history supports Coppola's position, as does an authoritative treatise, 5A Wright & Miller § 1336.3, citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 57 (2d Cir. 2000) (monetary sanctions imposed under Rule 11 on the court's own initiative are limited to penalties payable to the court). *See also Lamboy-Ortiz v. Ortiz-*

*Velez*, 630 F.3d 228, 244 n.27 (1st Cir. 2010) (same, citing revised Rule 11(c)(4)).[10]

Given this limitation, the court believes that the sanction that is most narrowly tailored to repair the damage done, is a published rebuke of Coppola for his churlish behavior.

## ORDER

For the foregoing reasons, the court formally <u>ADMONISHES</u> Attorney Coppola for the conduct identified in this decision. It further <u>ORDERS</u> that this decision be formally published by the Clerk. Absent an objection by any interested party filed within thirty (30) days of the date of this decision, it is the court's intention to order the surplus funds now held in the court registry to be paid over to Harriet Balerna as the claimant next in priority.

SO ORDERED.

/s/ Richard G. Stearns

_____

[10] Coppola also notes that the court should proceed with "special care" as he was deprived of shelter under Rule 11's "safe harbor" provision because of the court's sua sponte action. While special care is always appropriate in considering sanctions against an attorney in any context, the argument is less than compelling here where despite repeated warnings by the court, Coppola insisted on pressing his defamatory lines of questioning with Attorney Gilberti. Perhaps there is a history of bad blood between these two attorneys – the court is unaware of any – but even were that the case, it would not justify Coppola's vindictive questioning.

UNITED STATES DISTRICT JUDGE